IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RASBIAN M. WARD, #153328, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:18-CV-759-WKW-KFP |
| | ) | |
| CORIZON, INC, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I.  INTRODUCTION

Rasbian Ward, a state inmate, filed this 42 U.S.C. § 1983 action challenging actions that occurred at Staton Correctional Facility.[1] Doc. 15 at 2. Defendants are Corizon LLC, Dr. Scott Bell, and Dr. Karen Stone.[2] Ward seeks monetary damages for deliberate indifference to his medical needs, and he has sued the Defendants in both their official and individual capacities. Doc. 15 at 10-11. Defendants filed an Answer and Special Reports with supporting evidentiary materials, including affidavits, prison documents, and medical

---

[1] Ward filed his initial Complaint on August 17, 2018, seeking relief for alleged conduct between May 2016 and May 2018. After conducting its obligatory review under 28 U.S.C. § 1915(e)(2)(B), the Court concluded the Complaint was a "shotgun pleading" and ordered Ward to file an amended complaint that did not include claims unrelated to each other or claims outside the applicable statute of limitations. Doc. 11. Ward filed his Amended Complaint on October 29, 2018. Doc. 15.

[2] Corizon, LLC was incorrectly identified by Ward as Corizon, Inc. Doc. 27 at 1. Corizon contracted with ADOC to provide healthcare services to Alabama state inmates from November 1, 2007, through March 31, 2017. Doc. 22 at 2. Wexford Health Sources, Inc. has held the contract with ADOC since April 1, 2018. *Id*. Dr. Scott Bell was employed as the Medical Director at Staton under Corizon and Wexford. *Id*. The Complaint and Amended Complaint also named Ms. Barnette, Dr. Hood, and Dr. Herring as Defendants, but Ward later dismissed them. *See* Docs. 61, 64, 101.

records, in which they deny deliberate indifference to Ward's medical needs. Docs. 22, 27, 34, and 72.

After reviewing Defendants' documents, the Court ordered Ward to file a response supported by affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 77. The order specifically cautioned that the Court may, at any time after the deadline for Ward to respond and without further notice, treat a special report as summary judgment motion and, after considering any response by Ward, rule on the motion in accordance with the law. Doc. 77 at 2. Ward filed two responses to Defendants' Special Reports. Docs. 74, 88. The Court now construes the Special Reports (Docs. 22, 34, 72) as a motion for summary judgment and, upon consideration of the motion and supporting evidentiary materials, concludes summary judgment is due to be GRANTED.

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and alerting the court to portions of

the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

However, once the movant has satisfied this burden, the nonmovant is similarly required

to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324.

To avoid summary judgment, the nonmovant "must do more than simply show that there

is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether a genuine dispute for trial

exists, the court must view all the evidence in the light most favorable to the nonmovant

and draw all justifiable inferences from the evidence in the nonmoving party's favor.

*McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see* Fed. R.

Civ. P. 56(a).

## III.    DISCUSSION

### A.    Factual Background

Ward was 63 years old when he filed the Complaint, and he had been diagnosed

with paresthesia[3] in his arms and legs, with it being worse in his left leg. Doc. 22-1 at 21.

On August 24, 2017, he was diagnosed with degenerative joint disease with chronic left

leg radiculopathy, weakness, and pain. Doc. 22-1 at 6. Ward alleges that Dr. Scott Bell and

Dr. Karen Stone were deliberately indifferent to his medical needs, and he alleges

Corizon's policies resulted in this deliberate indifference. His deliberate indifference

claims arise out of two incidents concerning his healthcare.

---

[3] Dr. Bell testified that "paresthesia is "an abnormal condition" causing a sensation of burning, numbness, tingling, or prickling in the extremities. It can disappear quickly when it occurs due to things like hyperventilation, anxiety, or lying on the arm while asleep, but it can also be chronic and ongoing if it is caused by conditions such as diabetes, multiple sclerosis, or peripheral neuropathy. Doc. 22-1 at 3-4.

First, Ward alleges Dr. Bell "callously disregarded his severe nerve condition" by canceling a dye test to determine the severity of nerve damage and canceling surgery without ever seeing or examining him. Doc. 15 at 5. However, according to Dr. Bell's affidavit testimony, which is confirmed by the medical records, Nurse Charlie Waugh requested a CT myelogram, as recommended by Dr. Pearson, the neurosurgeon. Doc. 22-1 at 9; Doc. 124-1 at 1. However, a few days later, Nurse Waugh accepted the alternative treatment plan for Ward, which provided:

> [T]he medical necessity for CT myelogram is not met. The IM has chronic neuropathy evidenced by his EMG/NCS and L5-S1 superimposed neuropathy. The MRI is somewhat unimpressive with mild changes. The IM complains of pain but objectively on all encounters appears in no distress. No evidence of atrophy or significant loss of strength in the leg. Even if surgery is contemplated for L5-S1 (in terms of his generalized chronic neuropathy) how much gain is the IM going to achieve from his underlying chronic axonal neuropathy. Consider maximizing his pain medications along with short course steroids if required.

Doc. 124-1 at 1.

Second, Ward alleges deliberate indifference with respect to the medical treatment he received after he fell while walking up a set of stairs. Doc. 15 at 5–6. He claims the nurse, whom he identified as "Ms. Rice or Price," spoke to Dr. Bell by phone immediately after his initial examination in the healthcare unit and was instructed by Dr. Bell not to send him to the hospital but to admit him to the infirmary until Monday when a x-ray could be performed.[4] *Id*. at 6. While he was in the infirmary from September 29 through October 2, no pain medication was given to him for his hip injury, and Doctor Bell would not

---

[4] Later Plaintiff amended his Complaint to allege that it was Dr. Karen Stone who failed to order that he be given pain medication and sent to the hospital. Doc. 35-1 at 5–6; Doc. 61.

approve any pain medication until after the x-ray on Monday. *Id*. He "laid on his back from about 9:30 on 9-30-2017 until 2:30 p.m. on 10-2-2017 doing everything possible to keep from moving."[5] *Id*. at 6-7. When Plaintiff's hip was x-rayed around 2:30 p.m. on October 2, it revealed he had two fractures to his left hip, and he was immediately transported by ambulance to Jackson Hospital, where he had surgery to repair the hip fractures. Docs. 15 at 7; 22-1 at 7, 54, and 74–76.

The medical records demonstrate that Ward made repeated complaints of extreme pain following his fall. Doc. 22-1 at 38 (rated pain as 10/10); Doc. 22-1 at 43 (reported pain as 10/10 and "constant," "sharp," and "radiating"); Doc. 22-1 at 48 (rated pain as 10/10 and said "hurting really bad"); Doc. 22-1 at 50-51 (rated pain as 10/10 and stated Tylenol "not strong enough"); and Doc. 22-1 at 52 (reported pain as 10/10). The nurses observed "swelling" and "edema" to the left hip. Doc. 22-1 at 43, 48–49, 52, 55. Finally, the medical records note his activity level as "bed rest" with very limited mobility and the inability to get out of bed to use a urinal. Doc. 22-1 at 48–56.

The medical records also show that on September 29 Nurse Rice contacted Dr. Karen Stone at 10:00 p.m. by phone to report Plaintiff was experiencing "acute numbness/weakness" and "decreased ROM" in his left hip. Doc. 22-1 at 37. Dr. Stone ordered an x-ray for the following Monday. *Id*. Dr. Stone testified that she "was taking on-call calls over the weekend" of September 29, and the medical records show Nurse Rice

---

[5] Although Ward states he fell and was taken to the Staton HCU on September 30, 2017, the medical records show he fell and taken to Staton HCU by wheelchair on September 29, 2017, just before 10:00 p.m. Doc. 22-1 at 38.

called her to report Plaintiff's fall. *Id.*; Doc. 72-1 at 4. However, Dr. Stone does not recall the substance of the telephone call with Nurse Rice concerning Plaintiff's specific medical complaints, and she has no independent recollection beyond the medical records concerning the treatment ordered for Ward. Doc. 122-1 at 1-2.

Nurse Rice's testimony is consistent. She told Dr. Stone on the phone call that "Ward arrived in the health care unit in a wheelchair and informed the medical staff that he had fallen backwards going up the steps at Draper,[6] hurting his left hip and left knee and his pain was described as 10/10, and Mr. Ward was unable to move his left leg without pain." Doc. 121-1 at 2–3. She further testified that Dr. Stone gave her an order over the telephone to place Ward in the health care unit under observation and to provide him with Toradol 30 mg IM at that time and then an additional dose as needed for pain. *Id.* at 3. Dr. Stone also told her to have Ward x-rayed on Monday, October 2, 2021, when the x-ray technologist returned and to follow up with Dr. Bell after receipt of the x-ray results. *Id.*

Dr. Bell and Dr. Stone testified that there were no x-ray technologists on duty at Staton over the weekend in September 2017. Doc. 22-1 at 7; Doc. 72-1 at 4. They further testified and the medical records confirm that Ward was followed at the infirmary at Staton over the weekend by various nurses, including Nurse Rice, and that he was provided Toradol for pain. Doc. 22-1 at 7, 37–56; Doc. 72-1 at 4. Neither doctor has testified about the schedule of pain medication provided to Plaintiff over the weekend. *Id.* However, the Infirmary-Patient Fact Sheet Orientation completed on September 30 includes an order to

---

[6] This appears to be a typographical error, as documents filed by Ward and Defendants state that the incident occurred at Staton Correctional Facility.

"regulate pain level" and a list of medications.[7] Doc. 22-1 at 47. Toradol is not listed, but the medical records confirm that Ward was prescribed Toradol 30 mg for pain on September 29 and 30 to be given every eight hours as needed. Doc. 121-2 at 3. The medical records also confirm that Ward received a dose of Toradol on September 29 at 10:00 p.m. and on September 30 at 5:00 a.m.; that Dr. Stone prescribed Tylenol 650 mg three times a day for pain on October 1–3; and that Ward received Tylenol twice on October 1 and once on October 2 before going to Jackson Hospital Doc. 22-1 at 48–50, 52, 54; Doc. 121-2 at 1. On October 1, Nurse Rice also made Plaintiff a "hot pack" to apply to his left hip. Doc. 22-1 at 53.

In addition to his claims against the direct medical providers, Plaintiff claims Corizon is liable for the actions of the doctors because it had a policy permitting nurses to send an inmate to the hospital only in a life-threatening situation and requiring physician approval in a non-life-threatening situation. Doc. 15 at 8. He claims he was prescribed only medications that did not correct his problems or stop pain because of Corizon's policies, practices, and customs of "saving money through not approving for operations unless they have no other choice outside the death of the inmate." *Id.* However, Plaintiff offers no evidence that Corizon created or maintained such policies. Nurse Rice testified that Corizon had no specific written policies dictating when an inmate should receive health care treatment outside of the prison facility or when narcotics should be given to an

---

[7] The individual who signed this document has been identified as Terry Blair-Sowash, an LPN who no longer works for Wexford Health and for whom Wexford has no current contact information. The listed medications include Tums TiD PRN, HCTZ 25 OLO, Tylenol 650 TiD, Tegretol 100 BiD, and Neurontin 85 TiD with medicine times listed as "4a, 12n, 1800." Doc. 22-1 at 47.

inmate.[8] Doc. 121-3 at 2-3. According to Nurse Rice, the Medical Director at Staton or mid-level providers, such as nurse practitioners or physician assistants, determine when it is in the best interest of an inmate to go to a free-world health provider and whether the inmate should be given narcotics for pain.

### B.   Plaintiff's Official Capacity Claims Against Defendants

To the extent Ward sues the Defendants in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Thus, a state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity or Congress has abrogated it. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (waiver); *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996) (abrogation). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abrogated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990)). Accordingly, to the extent Ward sues Defendants in their official capacities, they are entitled to sovereign immunity for claims seeking monetary damages. *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding

---

[8] Nurse Rice is the Director of Nursing at Staton for Wexford Health Sources, Inc., which now holds the contract to provide healthcare to Alabama inmates, and she was an employee for Corizon when it held the contract. *See* Affidavit of Kelly Rice (Doc. 121-3).

that damages are unavailable from state official sued in official capacity). Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1429 (11th Cir. 1997). Thus, Defendants are entitled to summary judgment on Ward's claims seeking monetary damages against them in their official capacities.

### C.   Individual Capacity Claims of Deliberate Indifference

To prevail on a claim of denial of medical treatment, an inmate must show the defendant acted with deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000). Medical treatment of prisoners violates the Eighth Amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (quotation marks and citation omitted). A prison official is not "deliberately indifferent" unless he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (finding, under *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat properly or a delay in such treatment") (citation and internal quotations omitted). "A defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference." *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016). Within the Eleventh Circuit, medical malpractice and negligence do not constitute deliberate indifference:

Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan*, 511 U.S. 825, 833-38, 114 S.Ct. 1970, 1977-79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams*, 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr*., 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

Thus, to demonstrate deliberate indifference to a serious medical need, Ward must show (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and his injury. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–1307 (11th Cir. 2009). To make this showing, Ward must establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (finding that for liability to attach defendant must know and disregard excessive risk to prisoner's health or safety).

Regarding the objective component, a plaintiff must first show an objectively serious medical need, followed by a response by defendants inadequate enough to constitute an unnecessary and wanton infliction of pain, not merely accidental inadequacy,

negligence in diagnosis or treatment, or even medical malpractice actionable under state law. *Taylor*, 221 F.3d at 1258 (citations omitted). For the required subjective intent, a plaintiff must show the public official acted with an attitude of "deliberate indifference," which requires two things: an awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists and drawing of the inference. *Taylor*, 221 F.3d at 1258 (internal citations and quotations omitted).

Thus, deliberate indifference occurs only when a defendant knows of and disregards an excessive risk to inmate health or safety; is aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and draws that inference. *Farmer*, 511 U.S. at 837. An "official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Further, neither a difference of opinion on appropriate treatment nor the fact that the treatment was ineffective gives rise to a deliberate indifference claim. *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding mere fact that inmate desires different mode of diagnosis does not amount to deliberate indifference); *Adams*, 61 F.3d at 1545 (stating that whether additional diagnostic techniques or forms of treatment should have been used "is a classic example of a matter for medical judgment" and not a basis for Eighth Amendment liability) (citation omitted).

In determining whether a delay in medical treatment constitutes deliberate indifference, courts consider the seriousness of the medical need, whether delay worsened the medical condition, and the reason for the delay. *See Goebert v. Lee Cty.*, 510 F.3d 1312,

1327 (11th Cir. 2007); *Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003). Additionally, when an inmate complains that a delay in medical treatment rises to the level of a constitutional violation, he "must place verifying medical evidence in the record" establishing the detrimental effect caused by the delay. *Surber v. Dixie Cty. Jail*, 206 F. App'x 931, 933 (11th Cir. 2006) (internal citation omitted). Furthermore, the subjective knowledge of risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each individual Defendant must be judged separately and on the basis of what that person [knew at the time of the incident]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (citations omitted).

### 1.    Claims Against Dr. Scott Bell

To show deliberate indifference by Dr. Bell, Ward must demonstrate a serious medical need and that Dr. Bell's response to the need was more than accidental inadequacy, negligence, or medical malpractice. Ward claims Dr. Bell was deliberately indifferent when he cancelled Ward's dye test and surgery, but any decision regarding Ward's dye test and surgery was a matter of medical judgment, as Ward was diagnosed and an alternative treatment plan that did not involve surgery was approved by the medical professionals dealing with Ward's nerve condition. Docs. 22-1 at 9; 22-1 at 36; Doc. 124-1 at 1. Based on the alternative treatment plan, it was felt that surgery would not provide much relief for his underlying neuropathy and that, instead, his pain medications should be maximized with a short course of steroids, if required. The Court cannot second guess this medical judgment, and this claim lacks merit and is due to be dismissed.

Plaintiff also complains that Dr. Bell acted with deliberate indifference when he delayed his hip x-ray until October 2 and delayed sending him to Jackson Hospital pending the x-ray results. However, it is undisputed that Dr. Bell did not see Ward and was not notified of his pain before 1:00 p.m. on October 2. Doc. 22-1 at 7-8. Further, there were no x-ray technicians on duty at Staton the weekend following Ward's fall. Doc. 22-1 at 7; Doc. 72-1 at. 4. After being notified of Ward's fall, Dr. Bell ordered an x-ray around 1:00 p.m., the x-ray was taken around 2:30 p.m., and Ward was taken by ambulance to Jackson Hospital and admitted at 5:29 p.m. that same day. Doc. 15 at 7; 22-1 at 7-8, 54, 74-76. Before Dr. Bell was notified of Ward's pain, Ward was continuously monitored and treated by nurses in the Staton HCU.[9] Plaintiff has provided no evidence establishing any negative effect on his medical condition caused by any delay in receiving the hip x-ray or being transported to Jackson Hospital. Accordingly, the Court concludes Dr. Bell is entitled to summary judgment. *Surber,* 206 F. App'x at 933 (where plaintiff received "significant amount of medical treatment" and there was no evidence that "delay in his medical treatment had a detrimental effect on him," the court held plaintiff failed to establish deliberate indifference).[10]

---

[9] This action is distinguishable from *Brennan v. Comm'r, Alabama Dep't of Corr.*, 626 F. App'x 939, 944 (11th Cir. 2015), where doctors were aware of the plaintiff's pain and knew the proper course of treatment but withheld treatment. In this case, there is no evidence that Dr. Bell or Dr. Stone knew Ward's pain was not controlled by the Toradol or Tylenol that was prescribed to him.

[10] The Court notes that Dr. Bell saw Plaintiff on December 15, 2017, and recommended physical therapy because Ward was having trouble recovering from the hip fracture. Doc. 22-1 at 9. However, there is no evidence in the record that demonstrates any delay in receiving hip surgery negatively affected his recovery.

### 2.    Claims Against Dr. Stone

Ward alleges Dr. Karen Stone acted with deliberate indifference when she failed to send him to the hospital after his fall and failed to order that he be given pain medication. Doc. 35-1 at 5-6; Doc. 61. The medical records directly refute the claim that he was not prescribed or administered pain medication. Nurse Rice testified that Dr. Stone gave her the order to place Ward under observation and to give him a dose of Toradol 30 mg at that time and an additional dose as needed for pain. The fact sheet includes an order to regulate pain, and the medical records confirm that Ward was prescribed Toradol 30 mg on September 29 and 30, to be given every eight hours as needed for pain, and that two doses of Toradol were given to Ward on September 29 at 10:00 p.m. and September 30 at 5:00 a.m. The medical records confirm that Dr. Stone prescribed Tylenol 650 mg three times a day from October 1 through October 3, and he received Tylenol twice on October 1 and once on October 2 before going to Jackson Hospital. Accordingly, the Court concludes that Ward's allegation that Dr. Stone failed to prescribe pain medication lacks merit.

Ward complains that Toradol and Tylenol were not strong enough to control his pain, but the record establishes that Dr. Stone made a medical decision to order conservative pain medication. Doc. 121-1 at 2-3. Again, this decision is a matter of medical judgment that Plaintiff cannot challenge. *See Adams*, 61 F.3d at 1545. Further, there is no evidence that Dr. Stone, who was on-call over the weekend but not physically present at the HCU, received any additional information about Ward's unabated pain. *Compare Brennan*, 626 Fed App'x at 944 (claim for relief stated where evidence showed doctor was aware of plaintiff's pain, knew proper course of treatment, but withheld treatment).

Because Plaintiff has not shown that Dr. Stone knew about his continued pain, he has failed to establish the subjective standard of deliberate indifference. *Burnette,* 533 F.3d at 1331.

Concerning Ward's claim of deliberate indifference based on Dr. Stone's failure to send him to Jackson Hospital immediately following his fall, the Court concludes that this presents a classic case of medical judgment as to how to treat a potentially serious injury. As described above, the record demonstrates that Ward was routinely monitored and administered pain medication by nurses as prescribed by Dr. Stone while awaiting his hip x-ray on Monday, and Dr. Stone received no information concerning his continued complaints of pain over the weekend. Accordingly, Ward has failed to demonstrate a callous disregard of his medical condition by Dr. Stone, and she is entitled to summary judgment.

### 3.    Claim Against Corizon based on Respondeat Superior

Plaintiff claims Corizon is liable for the actions of the Defendant doctors' deliberate indifference because of its policies and customs. However, the law is well-settled that Ward is not entitled to relief from this entity based solely on the actions of its employees.[11] Indeed, liability under § 1983 may not be based on Corizon's role as the employer of the doctors or nurses who provided treatment to Ward. *See e.g., Massey v. Montgomery Cty. Det. Facility*, 646 F. App'x 777, 780 (11th Cir. 2016). For § 1983 liability to attach to a private corporation providing medical care to inmates, a plaintiff must allege his

---

[11] In considering Plaintiff's claims against Corizon, the Court recognizes that Ward has presented no evidence that treatment by Dr. Bell and Dr. Stone created a substantial risk to his health or that, with knowledge of his serious condition, they consciously disregarded the risk in ordering treatment. Therefore, the record is devoid of evidence showing that Dr. Bell and Dr. Stone acted with deliberate indifference to Ward's medical needs.

constitutional rights were violated as a result of an established policy or custom of that corporation. *Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997).

To support his claims, Plaintiff alleges Corizon had a policy permitting nurses to send inmates to the hospital only in life-threatening situations and requiring physician approval in non-life-threatening situations. Doc. 15 at 8. He also claims that he was prescribed medications that did not correct his problem or stop his pain because of Corizon's policies, practices, and customs of "saving money through not approving for operations unless they have no other choice outside the death of the inmate." *Id.* He argues these policies prevented Dr. Bell and Dr. Stone from getting him necessary care. However, Ward offers no evidence whatsoever that Corizon created or maintained these alleged policies. *See Brennan v. Headley*, 807 F. App'x 927, 937–938 (11th Cir. 2020) (judgment affirmed for Defendant Corizon where plaintiff was "unable to produce evidence beyond his own assertions of a 'persistent and wide-spread practice' that Corizon used to deny him adequate medical care in order to cut costs"). Contrary to Plaintiff's unsubstantiated claims, testimony shows that Corizon had no specific policies dictating when an inmate should be sent to an outside facility or given narcotics and that the medical director, nurse practitioners, and physicians' assistants made these decisions. Based on this undisputed record, the Court concludes that Corizon is entitled to summary judgment.

## IV.   CONCLUSION

For the reasons stated above, the Magistrate Judge RECOMMENDS that Defendants' Motion for Summary Judgment (Docs. 22, 34, 72) be GRANTED and that this case be DISMISSED with prejudice, with costs taxed against Plaintiff.

Further, it is ORDERED that by **November 1, 2021**, the parties may file objections to the Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made. Frivolous, conclusive, or general objections will not be considered by the Court. The parties are advised that this Recommendation is not a final order and, therefore, is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11th Cir. R. 3-1. *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 1st day of October, 2021.


/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE